IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

DAVID COLLUM, )
)
    Plaintiff, )
)
v. ) CV96-H-148-NE
)
CULLMAN PRODUCTS, INC., )
)
    Defendant. )

MEMORANDUM OF DECISION

Presently before the Court is the December 30, 1996 motion for summary judgment filed by defendant, Cullman Products, Inc. Pursuant to Orders entered January 7 and 31, 1997, the motion was deemed submitted, without oral argument, on February 14, 1997.

I. Procedural History

Plaintiff commenced this action by filing a one-count complaint in this Court on January 18, 1996. The complaint alleged that plaintiff had been employed by defendant for approximately 19 years, and then had developed an inner ear tumor. This condition necessitated a medical leave of absence, after which plaintiff alleged that Cullman Products refused to allow him to return to work. Plaintiff claimed that defendant's action was discrimination prohibited by the Americans with Disabilities Act.

## II. Standards for Evaluating a Summary Judgment Motion

The Eleventh Circuit has stated that district courts should use caution when taking employment discrimination cases away from the trier of fact by means of summary judgment. <u>Isenbergh v. Knight-Ridder Newspaper Sales, Inc.</u>, 84 F.3d 1380, 1384 (11th Cir. 1996). However, the Eleventh Circuit also recognizes that "[s]ummary judgments . . . are not rare in employment discrimination cases." <u>Earley v. Champion International Corp.</u>, 907 F.2d 1077, 1080. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which is designated 'to secure the just, speedy and inexpensive determination of every action.'" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986) (quoting Fed.R.Civ.P. 1). Given the ease of complying with the notice pleading requirements in asserting a discrimination claim, the Eleventh Circuit encourages district courts that "plaintiffs seeking to avoid summary judgment should be strictly held to the requirements of Rule 56(e); the plaintiff must present specific non-conclusory facts that would support a jury verdict against the particular defendant on discriminatory intent." <u>Ratliff v. DeKalb County</u>, 62 F.3d 338, 341 (11th Cir. 1995).

Where a plaintiff's discrimination claim is based on circumstantial evidence, the court employs the burden-shifting

2

framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). First, the plaintiff has the burden of establishing a prima facie case of discrimination.[1] Second, after plaintiff has presented a prima facie case, the burden of production shifts to the defendant, requiring an articulation of some "legitimate, nondiscriminatory reason" for the alleged discriminatory employment action. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). "[I]t is possible for the defendant to present such strong evidence of a nondiscriminatory rationale that summary judgment is warranted." Brown v. American Honda Motor Co., Inc., 939 F.2d 946, 950 (11th Cir. 1991), cert. denied, 502 U.S. 1058 (1992) (quoting Grigsby v. Reynolds Metals Co., 821 F.2d 590, 596 (11th Cir. 1987)).

Once the defendant presents legitimate, nondiscriminatory reasons for its action, then the plaintiff must prove by a preponderance of the evidence that the reasons offered by the defendant are a mere pretext for discrimination, and to persuade the fact-finder that the defendant intentionally discriminated

---

[1] In order to present a prima facie case of discrimination, plaintiff must show: (1) that he or she belongs to a protected class; (2) that he or she either applied and was qualified for a position for which the employer was seeking applicants or was satisfactorily performing the duties of the job; (3) that he or she was rejected or terminated; and (4) that, after the rejection, the position remained open and the employer continued to seek applicants for persons of plaintiff's qualifications. McDonnell Douglas, 411 U.S. at 802. Based on O'Connor v. Consolidated Coin Caterers Corp., ___ U.S. ___, 116 S.Ct. 1307, 1310 (1996), plaintiff need not show that the position at issue was filled by a person outside the protected class.

3

against the plaintiff. McDonnell Douglas, 411 U.S. at 804. In other words, "[a]fter a Title VII plaintiff makes out a prima facie case, and the defendant produces a legitimate nondiscriminatory explanation for its actions, the McDonnell-Burdine presumption drops from the case. At that point, the inquiry is whether the defendant intentionally discriminated against the plaintiff." Harris v. Shelby County Board of Education, 99 F.3d 1078, 1083 (11th Cir. 1996).

"[B]ecause the plaintiff bears the burden of establishing pretext [for discrimination], he must present 'significantly probative' evidence on the issue to avoid summary judgment." Isenbergh v. Knight-Ridder Newspaper Sales, Inc., 97 F.3d 436, 444 (11th Cir. 1996) (quoting Young v. General Foods Corp., 840 F.2d 825, 829 (11th Cir. 1988) (other citations omitted) (alterations in original). "At the summary judgment stage, once an employer articulates a legitimate, nondiscriminatory reason for the discharge, the burden shifts back to plaintiff to raise a genuine factual question as to whether the stated reason is mere pretext." Cortin v. Southland Int'l Trucks, 25 F.3d 1545, 1550 (11th Cir. 1994); Hairston v. Gainesville Sun Publ. Co., 9 F.3d 913, 920 (11th Cir. 1993).

Plaintiff may prove that the defendant intentionally discriminated against him either "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered

4

explanation is unworthy or credence." Carter v. City of Miami, 870 F.2d 578, 584 (11th Cir. 1989). "If the defendant's proffer of credible, nondiscriminatory reasons for its actions is sufficiently probative, then the plaintiff must come forward with specific evidence demonstrating that the reasons given by defendant were a pretext for discrimination." Brown, 939 F.2d at 950. "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, non-discriminatory reasons for its actions." Isenbergh, 97 F.3d at 444 (quoting Young, 840 F.2d at 830).

### III. Relevant Undisputed Facts

Plaintiff began his employment with Cullman Products in October 1973. (Collum Depo. at 31). Plaintiff spent the bulk of his time in the paint department, although he did work in other departments occasionally. (Id. at 100-01). In the paint department, plaintiff functioned as an "operator" and in a "set-up" role. (Id. at 105, 125). As an operator, plaintiff was responsible for placing items in a machine to be painted, and was required to bend, turn, and twist to accomplish this task. (Id. at 125). Plaintiff's last job at Cullman Products was in set-up, where he was responsible for the safe functioning of silk-screen

5

and roller coater machines, as well as ovens; plaintiff also was responsible for keeping the area around the machines clear of trash and debris. (Id. at 107). In this capacity, plaintiff spent most of his time standing and walking, and was required to lift up to 50 pounds on a daily basis. (Id. at 109-11). Plaintiff testified that both his positions in the paint department involved working around hazardous machinery with moving parts, so he (and other employees) had to be mindful of safety while working. (Id. at 107-08, 127-28).

Between 1977 and 1980, plaintiff began experiencing a "stuffed up" feeling in his right ear, accompanied by occasional bleeding. (Id. at 147-48). These symptoms prompted him to seek treatment in 1980, and he was diagnosed at that time with a middle ear tumor. (Id. at 148-49). Surgery was performed, but was unsuccessful in removing the entire tumor. (Id.). However, plaintiff was able to return to work almost immediately, and suffered no symptoms until 1990. (Id. at 150). At that time, his previous symptoms began to reappear, and plaintiff sought medical treatment again. (Id. at 150-51). Another surgery was performed, and again it was unsuccessful in removing the entire tumor. (Id. at 152).

Three years later, in 1993, plaintiff's symptoms reappeared again, and plaintiff underwent another surgical procedure, this time from another physician, Dr. Pappas. (Id.). That procedure was performed on May 6, 1993, and plaintiff took a leave of

6

absence from work at that time. (Id. at 152; Dahlke Depo. at 51). However, the surgery did not go as planned, and plaintiff's inner ear was damaged during the operation. (Collum Depo. at 153). As a result, immediately after the operation, plaintiff began experiencing severe vertigo, characterized by dizziness, nausea, and vomiting. (Id. at 160-61). The vomiting lasted for about a year, but plaintiff's vertigo continued. (Id. at 162).

Plaintiff was unable to return to work after the May 1993 surgery. He applied for and received benefits under a short-term disability insurance policy. (Id. at 189-90). These benefits lasted until November 1993. (Id. at 191). In September 1993, plaintiff applied for Social Security Disability benefits, and his application was granted on January 16, 1994. (Id. at 205). The Social Security Administration awarded plaintiff disability benefits retroactively to November 1993, and plaintiff continues to receive those benefits to the present day. (Id. at 205-06).

The record contains two letters from Dr. Pappas regarding plaintiff's condition, dated July 9 and September 14, 1993. In both, Dr. Pappas indicated that plaintiff was unable to return to work, but the letters also expressed the hope that plaintiff would be able to work again following treatment and physical therapy. (Plaintiff's Response to Requests for Admission).

In fact, plaintiff did go through a course of physical therapy designed to help him deal with his vertigo. Although plaintiff testified that his condition has not improved, he did

7

say that the therapy has allowed him to regain most of his ability to function. (Id. at 162-63). Plaintiff testified that, on September 9, 1994, he felt that he was ready to return to work, and called Dr. Pappas' office to receive permission to begin working. (Id. at 167).[2] Later that day, plaintiff telephoned Cullman Products and spoke with Evelyn Dahlke, telling her that he had been released to return to work by Dr. Pappas. (Id. at 211-21). According to plaintiff, Dahlke told him that he would have to speak to Pete Sims, and promised that Sims would return his call. (Id.). Sims did not call, and plaintiff called him on September 16, 1994. (Id. at 213). At that time, Sims informed plaintiff that the company had a policy of terminating any employee who had been on medical leave for more than 12 months. (Id. at 214). Thus, Sims told plaintiff that he had been terminated. (Id.).

It is undisputed that Cullman Products has an unwritten policy of terminating any employee who remains away on medical leave for more than 12 months. (Sims Depo. at 19). This policy

---

[2] Plaintiff testified in his deposition that he had a conversation with a nurse at Dr. Pappas' office, whom he asked about going back to work. (Id. at 167). According to plaintiff, the nurse said she asked Dr. Pappas about this, who told her that plaintiff was free to return to work if he felt up to it. (Id. at 167-68). Dr. Pappas remembers no such conversation, and denies ever releasing plaintiff to return to work. (Pappas Depo. at 19-21). Plaintiff's alleged conversation with the nurse, however, is irrelevant because it would be inadmissible hearsay if offered to prove the truth of the matter asserted by the nurse -- that plaintiff had been released to work by Dr. Pappas.

8

has been enforced at least a dozen times since 1977. (Dahlke Depo. at 32, 42). Only one exception to this policy has ever been made: James Duke was allowed to return to work after being away for more than one year, but he was re-hired in February 1993, when Cullman Products was engaged in recalling laid-off workers and expanding its work force from 436 employees to 464. (Pennington Aff.). The decision to re-hire Duke was based in part on this greater demand for personnel. (Id.).

However, while plaintiff was on disability leave, Cullman Products reduced its work force. In September 1994, there were no vacant openings in any of the departments in which plaintiff had worked at Cullman Products. (Id.). In addition, the number of "set-up" personnel had been reduced from 13 to 7; the paint department work force was cut in half from 42 to 21. (Id.). Finally, it is undisputed that, in September 1994, Cullman Products was planning layoffs, and actually reduced its total number of employees from 433 to 357 between September and November 1994. (Id.).

## IV. Analysis

Defendant advances two main arguments in support of its motion for summary judgment. It argues that plaintiff was terminated pursuant to a non-discriminatory company policy that limited medical leaves of absence to 12 months. According to the

9

company, there is no evidence in the record from which a reasonable trier of fact could conclude that the application of this policy to plaintiff was motivated by discrimination.  In addition, defendant also argues that there was no position left for plaintiff to fill in September 1994, and the ADA does not require an employer to create a new position as a "reasonable accommodation."  Defendant's second argument is that plaintiff's successful application for disability insurance and Social Security disability benefits estops him from claiming that he was "qualified" in September 1994, when he attempted to return to work.

The undisputed evidence in the record establishes that Cullman Products had a long-standing policy of terminating employees who remained away on medical leave for more than one year.  Plaintiff attempts to minimize this evidence by emphasizing that the policy was not written.  However, the undisputed evidence indicates that Cullman Products applied this policy to at least twelve individuals between 1977 and 1994; this evidence provides ample indication that the policy actually did exist.  Plaintiff has produced no evidence whatsoever that would indicate that the application of the policy to him was motivated by discrimination or was pretextual.  Additionally, it is clear from the record that Cullman Products could not have re-hired plaintiff in September 1994, when it had already laid off many workers and was planning to lay off many more.  Put simply,

Cullman Products was not required to revive one of the terminated positions in order to provide plaintiff with a job after he had lost his right to continued employment. <u>See, e.g.</u>, <u>Weiler v. Household Finance Corp.</u>, 101 F.3d 519, 526 (7th Cir. 1996).

The record here lacks any evidence from which a reasonable trier of fact could conclude that plaintiff was the victim of intentional discrimination. Rather, the undisputed evidence is that plaintiff was terminated pursuant to a non-discriminatory policy that limited medical leaves of absence to one year. Because there is no evidence from which a jury could infer discrimination, defendant's motion for summary judgment is due to be granted, and a separate Order and Judgment will be entered accordingly.[3]

---

[3] The Court also notes that defendant's judicial estoppel argument has significant merit. This Court has held before that a person who applies for and receives Social Security disability benefits is estopped from asserting that he is a "qualified individual" under the ADA. <u>See</u> <u>Taylor v. Food World</u>, 1996 WL 705952 (N.D. Ala. Dec. 5, 1996). The reason for this estoppel is obvious: a person must be completely incapable of performing any substantial gainful activity to be entitled to Social Security benefits, and a successful application for those benefits shows that the plaintiff is incapable of performing any work, including his former employment.

Here, plaintiff argues that, although he was disabled starting in May 1993, his physical therapy improved his ability to function so much that, by September 1994, he would have been able to return to work. Plaintiff points to the fact that the Social Security Administration allows recipients of disability benefits to attempt to return to work on a trial basis while still receiving benefits. The Court does not discount the possibility that a person might avoid the judicial estoppel effect of a successful claim for Social Security benefits by demonstrating that his condition had improved thereafter. Here, in fact, Dr. Pappas' letters indicate that the physical therapy

DONE this  2nd  day of April, 1997.

_____
SENIOR UNITED STATES DISTRICT JUDGE

---

might improve plaintiff's ability to function, and plaintiff testified to precisely that effect. However, there is no evidence to indicate that defendant was aware of plaintiff's alleged improvement from any authoritative source. As far as Cullman Products was concerned, plaintiff was unable to return to work and had been so disabled for sixteen months. Cullman Products relied on plaintiff's apparent inability to return to work in deciding to terminate him in accordance with its 12-month policy, and so the estoppel argument serves as an alternative reason to grant defendant's motion for summary judgment.